**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

VANALBERT SIEGRIST,

          Plaintiff,

   v.

J.J. JOHNSON, et al.,

          Defendants.

)
)
)
)
)
)
)
)
)
)
)
)

Case No.: 1:10-cv-01976-LJO-SAB (PC)

FINDINGS AND RECOMMENDATIONS RECOMMENDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT BE GRANTED

[ECF No.  72]

      Plaintiff Vanalbert Siegrist is appearing pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983.

      Currently before the Court is Defendants' motion for summary judgment, filed July 13, 2016.

**I.**

**RELEVANT HISTORY**

      This action is proceeding on Plaintiff's second amended complaint against Defendants Nurse Stringer and Doctor Nguyen for deliberate indifference to a serious medical need in violation of the Eighth Amendment.[1]

---

[1] Defendant Johnson was dismissed from the action, without prejudice, pursuant to Federal Rule of Civil Procedure 4(m), and Defendant Dutra was dismissed from the action because Plaintiff failed to exhaust the administrative remedies.  (ECF Nos. 52, 53, 55.)

After filing an answer to the complaint and the issuance of the discovery and scheduling order, Defendants Stringer and Nguyen filed a motion for summary judgment on July 13, 2016.  (ECF No. 72.)  Plaintiff did not file an opposition within twenty-one days after the date of service of Defendants' motion, and the motion for summary judgment is deemed submitted for review without oral argument.  Local Rule 230(l).

## II.

## LEGAL STANDARD

Any party may move for summary judgment, and the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mut. Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011).  Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1) (quotation marks omitted).  The Court may consider other materials in the record not cited to by the parties, but it is not required to do so.  Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001); accord Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

In judging the evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, Soremekun, 509 F.3d at 984 (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted).

A verified complaint may be used as an opposing affidavit under Rule 56, so long as it is based on personal knowledge and sets forth facts admissible in evidence.  See Schroeder v. McDonald, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though the verification was not in conformity with 28 U.S.C. § 1746, plaintiff stated

under penalty of perjury that the contents were correct, and the allegations were not based purely on his belief but on his personal knowledge).  In this case, Plaintiff's complaint was made under penalty of perjury and is considered as evidence in evaluating Defendants' motion for summary judgment.

### III.

### DISCUSSION

**A.      Summary of Plaintiff's Second Amended Complaint**

On June 11, 2009, Plaintiff told the medication line LVN that he was having disorientation and equilibrium problems, severe depth perception issues, and other symptoms of something not right. The medication line LVN told Plaintiff that if the problems persisted, he should let the medical staff know and "she would see what she could do to get Plaintiff in to see the doctor."

On June 12, 2009, Plaintiff tried to go directly to the clinic to see the doctor, and Dutra told Plaintiff he "couldn't see [Plaintiff's] symptoms anyway."  Johnson agreed with Dutra and refused to allow Plaintiff to see a doctor.  Later that day, Plaintiff had "some kind of seizures" and fell off his bunk bed, causing Plaintiff to "painfully bust[] up his knee . . . ."  Plaintiff claims he still has scars on his knee to this day as a result of the fall.

The next morning, on June 13, 2009, Plaintiff went to the medication line and informed Defendant Stringer of the fall and that his symptoms were getting worse.  Defendant Stringer told Plaintiff he "was probably drunk" and "there was nothing they could do anyway."  At noon that same day, Plaintiff again informed Defendant Stringer that his conditions were worsening, and "yet again nothing was done to get Plaintiff in to see the doctor[.]"  Plaintiff informed the evening medical line LVN that his conditions were continuing to worsen, but the LVN "refused to let Plaintiff see a doctor."

The following morning, on June 14, 2009, Plaintiff went to the medication line and told Defendant Stringer his symptoms had worsened, but was "denied access to the doctor on duty."  It took Plaintiff [three] tries" to take his medications because of his worsening depth perception.  That afternoon Plaintiff again attempted to see a doctor which was denied by LVN Stringer.  At the evening medication line, Plaintiff informed an LVN that his symptoms were worse and things were getting dangerous for him, but the LVN refused to allow Plaintiff to see a doctor.

At approximately 6:00 p.m. that evening, Plaintiff "blacked out and had several seizures." Plaintiff's cellmate "found [him] on the floor of his assigned cell . . . unresponsive." Plaintiff was taken to the hospital where, three days later, a doctor found Plaintiff's "Dilantin toxicity levels were at least four to five times the high side of twenty" and diagnosed Plaintiff with "Dilantin toxicity." Plaintiff was informed the conditions he had complained of June 12 through June 14, 2009, were "side effects from being over medicated on Dilantin and Diflucan that [were] prescribed by prison physicians."

Plaintiff was hospitalized for eleven days while his Dilantin toxicity levels were lowered to "normal, safe, non-life threatening levels." Dr. Griffin at the outside hospital wrote that the prison medical staff must not prescribe Diflucan to Plaintiff any longer because "it almost killed him back at Pleasant Valley State Prison (PVSP) Dr. Nguyen." However, upon returning to Pleasant Valley State Prison (PVSP), Defendant Nguyen "placed Plaintiff back on the same medication" despite Plaintiff's objection because he did not know what else to do.

**B.    Statement of Undisputed Facts**[2]

1.    Plaintiff was treated at Pleasant Valley State Prison (PVSP) on March 17, 2009, by Physician's Assistant Das, who noted Plaintiff's complaints of night sweats and body aches.  (L. Nguyen Decl. ¶ 4, ECF No. 72-4.)

2.    Plaintiff was treated for possible Valley Fever and started on Diflucan that day at 400 milligrams daily to combat the Valley Fever.  (Id.)

3.    Plaintiff was also taking Dilantin to control his seizures.  (Pl.'s Dep. at 11:23-12:6; ECF No. 72, Ex. A.)

---

[2] Plaintiff neither admitted or denied the facts set forth by defendant as undisputed nor filed a separate statement of disputed facts.  Local Rule 56-260(b).  Therefore, the Court was left to compile the summary of undisputed facts from Defendants' statement of undisputed facts and Plaintiff's verified complaint.  A verified complaint in a pro se civil rights action may constitute an opposing affidavit for purposes of the summary judgment rule, where the complaint is based on an inmate's personal knowledge of admissible evidence, and not merely on the inmate's belief.  McElyea v. Babbitt, 833 F.2d 196, 197-98 (9th Cir. 1987) (per curium); Lew v. Kona Hospital, 754 F.2d 1420, 1423 (9th Cir. 1985); F.R.C.P. 56(e). Because plaintiff neither submitted his own statement of disputed facts nor addressed defendants' statement of undisputed facts, the court accepts defendants' version of the undisputed facts where plaintiff's verified complaint is not contradictory. The Court notes that concurrently with their motion for summary judgment, Defendants served Plaintiff with the requisite notice of the requirements for opposing the motion.  Woods v. Carey, 684 F.3d 934, 939-41 (9th Cir. 2012); Rand v. Rowland, 154 F.3d 952, 960-61 (9th Cir. 1998).

4. An x-ray of March 17, 2009, showed pneumonia in Plaintiff's right lower lobe of his lung.  (L. Nguyen Decl. ¶ 4.)

5. Plaintiff's Valley Fever test of March 26, 2009, was negative, but a follow-up lab test of May 1, 2009, showed that Plaintiff did have a primary coccidioidal infection (Valley Fever) which was well focalized.  (Id.)

6. Plaintiff passed out at PVSP on June 14, 2009, and was transferred to an outside hospital, Coalinga Regional Medical Clinic (CRMC), with an altered mental status.  (L. Nguyen Decl. ¶ 6.)

7. Dr. Nguyen was not on duty on June 14, 2009.  (Id.)

8. Plaintiff was given a CT scan of his head and cervical spine at CRMC which was negative.  (Id.)

9. While at CRMC, Plaintiff was diagnosed with Dilantin toxicity, possibly exacerbated by Diflucan, Valley Fever, and reactive airway disease.  (Id.)

10. Plaintiff was hospitalized at CRMC until June 25, 2009, when he returned to PVSP. (Id.)

11. Upon discharge from CRMC, his treating doctor, Dr. Paul Griffin, ordered that Plaintiff be placed on 260 milligrams of Dilantin, daily, to avoid future Dilantin toxicity.  (Id.)

12. Dr. Nguyen assessed Plaintiff on June 26, 2009, upon Plaintiff's return to PVSP.  (Id. ¶ 7.)

13. Plaintiff complained to Dr. Nguyen about the side effects of Dilantin and Diflucan after being evaluated and treated for Dilantin toxicity, so Dr. Nguyen prescribed Diflucan and Dilantin at much lower doses of 400 milligrams daily for Diflucan and 100 milligrams for Dilantin, with close monitoring with blood tests for Dilantin levels and follow up visits.  (Pl.'s Dep. at 34:1-8; ECF No. 72, Ex. A.)

14. Dr. Nguyen ultimately discontinued Plaintiff's Dilantin prescription on July 22, 2009, because lab results for Plaintiff's Dilantin levels came back showing mildly elevated Dilantin levels at 29.89 micrograms/ml.  (L. Nguyen Decl. ¶ 7.)

15. Plaintiff's seizure disorder was then being treated with the antiepileptics Kepra and Neurontin.  (Id.)

16. Plaintiff was also under the care of a Neurologist through PVSP's telemedicine clinic. (Id.)

17. Plaintiff was started on Dilantin again on September 9, 2010, by Dr. Taherpour per recommendation from the neurologist because Plaintiff's seizures were not controlled and Plaintiff had been off Diflucan since June 25, 2010.  (L. Nguyen Decl. ¶ 9; Pl.'s Dep. at 34:9-15; ECF No. 72, Ex. A.)

18. Plaintiff was transferred to Twin Cities Community Hospital on November 29, 2010, for Dilantin toxicity, seizure disorder, Ataxia, and a history of Valley Fever.  (L. Nguyen Decl. ¶ 10.)

19. The hospital performed a lab workup of Plaintiff that showed a Dilantin level high of 98 micrograms/ml.  (Id.)

20. Plaintiff's Dilantin level while at PVSP was only 70 micrograms/ml. at approximately ten hours before he was admitted to Twin Cities Memorial Hospital.  (Id.)

21. Medical personnel at Twin Cities Community Hospital noted that Plaintiff was being given a relatively low dose of Dilantin at 200 milligrams daily, and they suspected that the spike in Plaintiff's Dilantin levels to 98 may have been because Plaintiff was storing his medication and taking it in lump dosages.  (Id.)

22. Dr. Breytenbach's assessment was that Plaintiff suffered from "Dilantin toxicity with a Dilantin level increasing and most consistent with patient taking excess of his dosage that should be 200 milligrams at night."  (Id.)

23. Dr. Breytenbach also suspected that Plaintiff "likely [was] storing his medication in his cheek and then swallowing them later in a large amount."  (Id.)

24. Dr. Breytenbach's discharge orders stated that Plaintiff could be restarted on Dilantin "at 200 milligrams daily, but his levels should be monitored and efforts should be made to make sure the patient does not store or check his medication and take them at a later time in lump."  (Id. ¶ 11.)

25. Plaintiff's Dilantin was withheld on December 2, 2010, because his Dilantin levels were still high at 34 microgram/ml. (Id.)

26. Plaintiff was seen by the neurologist, Dr. Jumao, on December 7, 2010, because Plaintiff's Dilantin prescription was not adjusted and Plaintiff was recommended for a mental health evaluation to rule out suicidal gesture by recent Dilantin toxicity. (Id.)

27. Plaintiff had refused taking Dilantin as documented on progress notes from visits with other medical providers in the prison on December 31, 2010, and January 6, 2011. (Id.)

28. Dr. Nguyen knew that Plaintiff was placed on Dilantin for his seizure disorder and Diflucan to treat his Valley Fever. (Id. ¶ 12.)

29. Dr. Nguyen was aware that the medications containing Diflucan have been known to interact with drugs such as Dilantin, causing very delayed metabolism of the Dilantin, thereby resulting in Dilantin toxicity. (Id.)

30. Plaintiff was doing well on 800 milligrams of Diflucan daily as prescribed by Dr. Ortiz-Singh without having any signs and symptoms of toxicity. (Id.)

31. Dr. Nguyen therefore refilled and continued the same dosage for Plaintiff. (Id.)

32. Upon Plaintiff's return to PVSP from CRMC in June of 2009, Dr. Nguyen prescribed Diflucan and Dilantin at much lower doses of 400 milligrams daily for Diflucan and 100 milligrams daily for Dilantin. (L. Nguyen Decl. ¶ 13; Pl.'s Dep. at 34:1-4; ECF No. 72, Ex. A.)

33. Dr. Nguyen also ordered closed monitoring of Plaintiff's blood for Dilantin levels, and follow up visits, to help guard against Dilantin toxicity. (L. Nguyen Decl. ¶ 13.)

34. Dr. Nguyen ultimately discontinued Plaintiff's Dilantin prescription on July 22, 2009, because Plaintiff's lab results showed mildly elevated Dilantin levels at 29.89 micrograms/ml. (L. Nguyen Decl. ¶ 13; Pl.'s Dep. at 34:5-8; ECF No. 72, Ex. A.)

35. Dr. Nguyen was not deliberately indifferent to Plaintiff's medical needs when Plaintiff suffered a second episode of Dilantin toxicity on November 29, 2010, because Plaintiff was not Dr. Nguyen's patient at that time, and Dr. Nguyen was not treating Plaintiff. (L. Nguyen Decl. ¶¶ 8, 14; Pl.'s Dep. at 34:9-15; ECF No. 72, Ex. A.)

7

36. Dr. Nguyen was assigned to a different area in the prison at the time. (L. Nguyen Decl. ¶¶ 8, 14.)

37. Plaintiff's Dilantin prescription was for 200 milligrams daily at that time. (L. Nguyen Decl. ¶ 14.)

38. Dr. Breytenbach postulated that Plaintiff's Dilantin toxicity was not the result of a daily 200 milligram dosage, but that Plaintiff instead hoarded his Dilantin medication and consumed it in a large dosage. (Id.)

39. Nurse Stringer worked as a licensed vocational nurse assigned to the Facility A medical clinic at Pleasant Valley State Prison in June of 2009. (Declaration of M. Stringer (Stringer Decl.) ¶ 3; ECF No. 72-5.)

40. Nurse Stringer was responsible for providing nursing services and distributing prescribed medications to the inmates in Housing Units 3 and 5. (Id.)

41. Nurse Stringer has encountered inmates who were acting peculiar. (Id. ¶ 4.)

42. In those instances, Nurse Stringer asked the inmate-patient if he was drinking inmate-manufactured alcohol or took medications that were not on his medication administration record (MAR). (Id.)

43. Any professional medical provider would ask such questions because it is important to be able to eliminate potential causes of the patient's peculiar behavior in order to properly diagnose and treat the true cause of the behavior. (Id.)

44. If Plaintiff were ill on June 13 or 14, 2009, he would have not been seen by a yard doctor because those days were a Saturday and a Sunday. (Stringer Decl. ¶ 5.)

45. Plaintiff would have been sent to the Treatment and Triage Area (TTA) if he needed to see a doctor that day. (Id.)

46. The TTA was notified that Plaintiff was found with an "altered level of consciousness" at approximately 5:55 p.m. on June 14, 2009. (Id. ¶ 6.)

47. Nurse Stringer was not on duty when this occurred because her shift ended at 2:00 p.m. that day. (Id.)

48.     Plaintiff was brought to the TTA at 6:15 p.m. that day and was examined by Registered Nurse Roca.  (Id.)

49.     Plaintiff was sluggish, slow to respond to stimulus, and unable to focus when examined by Dr. Susan Pido shortly thereafter.  (Id.)

50.     Dr. Pido ordered that Plaintiff was transferred to Coalinga Regional Medical Center that evening for further evaluation.  (Id.)

**C.     Defendants' Motion for Summary Judgment**

Defendants L. Nguyen and M. Stringer move for summary judgment on the ground that they did not violate Plaintiff's right to be free from deliberate indifference to his medical needs under the Eighth Amendment to the Constitution of the United States.  Specifically, L. Nguyen argues that the evidence shows that he provided Plaintiff the proper medical care, and Plaintiff cannot produce evidence that M. Stringer was subjectively deliberately indifferent to his medical condition.

1.     Applicable Legal Standard

While the Eighth Amendment of the United States Constitution entitles Plaintiff to medical care, the Eighth Amendment is violated only when a prison official acts with deliberate indifference to an inmate's serious medical needs.  Snow v. McDaniel, 681 F.3d 978, 985 (9th Cir. 2012), overruled in part on other grounds, Peralta v. Dillard, 744 F.3d 1076, 1082-83 (9th Cir. 2014); Wilhelm v. Rotman, 680 F.3d 1113, 1122 (9th Cir. 2012); Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006).  Plaintiff "must show (1) a serious medical need by demonstrating that failure to treat [his] condition could result in further significant injury or the unnecessary and wanton infliction of pain," and (2) that "the defendant's response to the need was deliberately indifferent."  Wilhelm, 680 F.3d at 1122 (citing Jett, 439 F.3d at 1096).  Deliberate indifference is shown by "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need, and (b) harm caused by the indifference."  Wilhelm, 680 F.3d at 1122 (citing Jett, 439 F.3d at 1096).  The requisite state of mind is one of subjective recklessness, which entails more than ordinary lack of due care.  Snow, 681 F.3d at 985 (citation and quotation marks omitted); Wilhelm, 680 F.3d at 1122.

///

///

9

1    "A difference of opinion between a physician and the prisoner - or between medical

2    professionals - concerning what medical care is appropriate does not amount to deliberate

3    indifference." Snow v. McDaniel, 681 F.3d at 987 (citing Sanchez v. Vild, 891 F.2d 240, 242 (9th

4    Cir. 1989)); Wilhelm v. Rotman, 680 F.3d at 1122-23 (citing Jackson v. McIntosh, 90 F.3d 330, 332

5    (9th Cir. 1986)).  Rather, Plaintiff "must show that the course of treatment the doctors chose was

6    medically unacceptable under the circumstances and that the defendants chose this course in conscious

7    disregard of an excessive risk to [his] health." Snow, 681 F.3d at 988 (citing Jackson, 90 F.3d at 332)

8    (internal quotation marks omitted).

9            2.    Defendant L. Nguyen

10           Plaintiff claims that Dr. Nguyen "almost killed him" by prescribing the combination of

11   Dilantin and Diflucan medications for Plaintiff, and that Dr. Nguyen continued that prescription

12   combination after his return from the hospital because Dr. Nguyen "didn't know what else to do."

13   (ECF No. 38, Sec. Am. Compl., at 7:25-28 and 8:2-6.)

14           Although Plaintiff claims that certain licensed vocational nurses did not allow him to be

15   examined by a doctor on June 11, 2009, Dr. Nguyen declares that he treated Plaintiff as his primary

16   care doctor on June 11, 2009, at PVSP.[3]  (L. Nguyen Decl. ¶ 5.)  Plaintiff complained to Dr. Nguyen

17   of feeling ill with symptoms of Valley Fever that day.  (Id.)  Dr. Nguyen declares that Plaintiff did not

18   complaint of lightheadedness and trouble with his balance during this visit, which would demonstrate

19   possible Dilantin toxicity.  (Id.)  Plaintiff was diagnosed with Valley Fever

20   (coccidiodomycosis)/pneumonia, improving slowly, and stable seizure disorder.  (Id.)  Dr. Nguyen

21   was aware that Plaintiff had a seizure disorder without seizure activity since he had a prior clinic visit

22   at PVSP on May 12, 2009, with Dr. Ortiz-Singh.  (Id.)  Dr. Nguyen refilled Plaintiff's seizure

23   medications (Dilantin at 800 milligrams daily, as prescribed by Dr. Ortiz-Singh, and Neurontin) on

24   June 11, 2009, and continued Plaintiff's Diflucan prescription because there was no medical reason

25

26

27   ---
     [3] The Court notes that Plaintiff's claim against Defendant Dr. Nguyen does not arise from any treatment or non-treatment
     on June 11, 2009, and such information is provided purely as background facts leading up to his claim against Defendant
     Nguyen.  Indeed, these facts were relevant to Plaintiff's claim against Dutra-who has been dismissed from the action based
28   on Plaintiff's failure to exhaust the administrative remedies.

1   not to.  (Id.)  On the same date, Dr. Nguyen also ordered testing to monitor Plaintiff's cocci titer and

2   Dilantin levels to track the progress of his Valley Fever, and to guard against Dilantin toxicity.  (Id.)

3        On June 14, 2009, Plaintiff passed out at PVSP and was transferred to an outside hospital,

4   CRMC, with an altered mental status.   Dr. Nguyen was not on duty on June 14, 2009.  (L. Nguyen

5   Decl. ¶ 6.)  While at CRMC, Plaintiff was diagnosed with Dilantin toxicity, possibly exacerbated by

6   Diflucan, Valley Fever, and reactive airway disease.  (Id.)  Plaintiff was hospitalized until June 25,

7   2009, when he returned to PVSP.  (Id.)  Contrary to Plaintiff's claim, upon Plaintiff's discharge from

8   CRMC, his treating physician, Dr. Paul Griffin, ordered that Plaintiff be placed on 260 milligrams of

9   Dilantin, daily, to avoid future Dilantin toxicity.  (Id.)

10        Upon Plaintiff's return to PVSP, and after Plaintiff complained to Dr. Nguyen of the side

11   effects of Dilantin and Diflucan, Dr. Nguyen prescribed 400 milligrams daily of Diflucan and 100

12   milligrams daily of Dilantin, with close monitoring including blood tests for Dilantin levels and follow

13   up visits. (L. Nguyen Decl. ¶ 7.)  Plaintiff's Dilantin was subsequently discontinued on July 22, 2009,

14   because the lab results revealed Plaintiff's Dilantin levels to be mildly elevated at 29.89

15   micrograms/ml.  (Id.)  Plaintiff's seizure disorder was then being treated with antiepileptics Kepra and

16   Neurontin.  (Id.)  Plaintiff was also under the care of a neurologist through PVSP's Telemedicine

17   Clinic.  (Id.)   Dr. Nguyen last provided care for Plaintiff on September 3, 2009, as Dr. Nguyen was

18   transferred to another area of the prison due to staff shortages.  (Id. ¶ 8.)

19        On September 9, 2010, Plaintiff was started on Dilantin again by Dr. Taherpour on the

20   recommendation from the neurologist because Plaintiff's seizures were not controlled, and Plaintiff

21   had been off Diflucan since June 25, 2010.  (Id. ¶ 9.)

22        On November 29, 2010, Plaintiff was transferred to Twin Cities Community Hospital for

23   Dilantin toxicity, seizure disorder, Ataxia, and history of Valley Fever.  (Id. ¶ 10.)  The lab work

24   performed at the hospital showed a high Dilantin level of 98 micrograms/ml.  Plaintiff's Dilantin level

25   while at PVSP was only 70 micrograms/ml. approximately ten hour before he was admitted to Twin

26   Cities Memorial Hospital.  (Id.)  Medical personnel at the hospital noted that Plaintiff had been

27   prescribed a relatively low dose of Dilantin at 200 milligrams daily, and they suspected that the spike

28

11

in Plaintiff's Dilantin level may have been caused by Plaintiff storing his medication and taking it in lump dosages.  (Id.; Dr. Hendrick Breytenbach report, Ex. B.)

In Dr. Breytenbach's December 1, 2010, discharge order it was indicated that Plaintiff could be restarted on Dilantin "at 200 milligrams daily, but his levels should be monitored and efforts should be made to make sure the patient does not store or check his medication and take them at a later time in lump." (L. Nguyen Decl. ¶ 11; Dr. Hendrick Breytenbach report, Ex. B.)  Plaintiff was not provided Dilantin on December 2, 2010, because his Dilantin levels were still high at 34 microgram/ml.  On December 7, 2010, Plaintiff was seen by the neurologist, Dr. Jumao because his Dilantin prescription was not adjusted and Plaintiff was recommended for mental health evaluation to rule out suicidal gesture due to his recent Dilantin toxicity.  It was subsequently noted that Plaintiff refused to take Dilantin as documented on progress notes from visits with other medical providers in the prison on December 31, 2010 and January 6, 2011.  (L. Nguyen Decl. ¶ 11.)

Based on the uncontroverted evidence, there is basis to find that Dr. Nguyen was deliberately indifferent to Plaintiff's serious medical needs by first initially prescribing Dilantin and then subsequently placing Plaintiff back on Dilantin following his return from the outside hospital.  In order to rebut the evidence, Plaintiff is required to prove that Dr. Nguyen was actually aware of facts from which an inference could be drawn that a substantial risk of harm for Dilantin toxicity existed, and that Dr. Nguyen actually drew that inference, but nevertheless disregarded the risk to Plaintiff's health. Farmer v. Brennan, 522 U.S. 825, 837-838 (1994).  Plaintiff has failed to do so.  Although Plaintiff's complaint is verified and is considered an opposing affidavit, Plaintiff may not rely on general, conclusory assertions set forth in his complaint to counter Defendant's specific evidence.  Rather, Plaintiff's medical records, and Dr. Nguyen's examination notes reveal that Dr. Nguyen believed it was reasonable to continue with the dosages of Dilantin and Diflucan that Plaintiff was taking in 2009. At the time Dr. Nguyen initially prescribed Dilantin on June 11, 2009, there was no medical reason to change such prescription as there was no reason for Dr. Nguyen to suspect that Plaintiff was in danger of Dilantin toxicity, and Plaintiff has presented no evidence to the contrary.  There is likewise no evidence that Dr. Nguyen acted with deliberate indifference in prescribing Dilantin after Plaintiff returned to PVSP on June 26, 2009, from the hospital.  Rather, upon Plaintiff's return Dr. Nguyen

reasonably treated Plaintiff more conservatively by prescribing 400 milligrams daily of Diflucan and 100 milligrams daily of Dilantin, with close monitoring with blood tests for Dilantin levels and follow up visit.  In fact, contrary to Plaintiff's claim, Dr. Nguyen's Dilantin prescription was much lower than the 260 milligrams daily level that Dr. Griffin of Coalinga Regional Medical Center noted was safe. Indeed, Plaintiff corroborated such finding at this deposition:

> Q.      But we do know that Dr. Nguyen dropped [Dilantin] to 100 milligrams a day on June 25th when you came back from the hospital, right?
>
> A.      Yes, he dropped it to 100 milligrams a day.

(Pl.'s Dep. at 34:1-4)

Dr. Nguyen also discontinued Plaintiff's Dilantin prescription on July 22, 2009, because lab results for Plaintiff's Dilantin levels came back showing mildly elevated Dilantin levels (L. Nguyen Decl. ¶ 7), which Plaintiff acknowledged at his deposition.

> Q.      Okay.  And then he ultimately took you off [Dilantin] a relatively short time after that; is that right?
>
> A.      Yeah, I'll agree with that.  I'll testify to that.

(Pl.'s Dep. at 34:5-8.)

Plaintiff's medical records, and Dr. Nguyen's examinations of Plaintiff demonstrate that Dr. Nguyen believed it was reasonable ton continue with the dosages of Dilantin and Diflucan that Plaintiff was in June 2009.  Dr. Ngueyn was aware that Plaintiff was taking those medications together, and he was also aware that the combination of those medications could lead to Dilantin toxicity, and that is why he also ordered testing to guard against such danger.  Plaintiff has not submitted specific evidence to refuse Defendant's description of the steps he took to address Plaintiff's medical condition regarding his Dilantin levels, and Defendant has demonstrated that he acted reasonably under the circumstances and based on Plaintiff's medical health records.  Accordingly, Defendant Dr. Nguyen is entitled to summary judgment on Plaintiff's claim that he acted with deliberate indifference by prescribing certain medications to treat his medical conditions.

///

///

13

3.      Defendant M. Stringer

Plaintiff contends that on the morning of June 13, 2009, he went to the medication line and informed  Defendant Stringer of the fall and that his symptoms were getting worse.  Defendant Stringer told Plaintiff he "was probably drunk" and "there was nothing they could do anyway."  At noon that same day, Plaintiff again informed Defendant Stringer that his conditions were worsening, and "yet again nothing was done to get Plaintiff in to see the doctor[.]"  Plaintiff informed the evening medical line LVN that his conditions were continuing to worsen, but the LVN "refused to let Plaintiff see a doctor."

The following morning, on June 14, 2009, Plaintiff went to the medication line and told Defendant Stringer his symptoms had worsened, but was "denied access to the doctor on duty."  It took Plaintiff [three] tries" to take his medications because of his worsening depth perception.  That afternoon Plaintiff again attempted to see a doctor which was denied by LVN Stringer.  Later that evening, Plaintiff was found in an altered level of consciousness and was transferred to Coalinga Regional Medical Center for further evaluation.

Defendant Stringer declares that she worked as a licensed vocational nurse to the Facility A medical clinic at PVSP in June of 2009.  (ECF No. 72-5, Stringer Decl. ¶ 3.)  Nurse Stringer was responsible for providing nursing services and distributing prescribed medications to the inmates in Housing Units 3 and 5.  (Id.)

Nurse Stringer does not recall Plaintiff complaining of being sick on June 13 or 14, 2009, or if he appeared disorientated on those days.  (Id. ¶ 4.)  Nurse Stringer declares that she never accused Plaintiff of being drunk when he allegedly complaint of being dizzy and weak, and she never told Plaintiff there was nothing that could be done.  (Id.)  Nurse Stringer declares that she would consider such a response to be highly unprofessional, disrespectful, and counterproductive to her treatment of the inmate-patient, and not in the inmate-patient's best interests.  (Id.)  Nurse Stringer further declares that she would have remembered if she encountered Plaintiff with an altered mental state, or if he reported those symptoms to her, because those inmate-patient interactions stand out in her mind.  (Id.)

However, if Plaintiff reported ill on June 13 or 14, 2009, he would not have been seen by a yard doctor because those days were a Saturday and a Sunday, and Plaintiff would have been sent to the Treatment and Triage Area (TTA) if he needed to see a doctor.  (Id. ¶ 5.)

Nurse Stringer reviewed medical records from Plaintiff's medical file (Unit Health Record (UHR)) in order to prepare her declaration.  The UHR revealed that TTA was notified that Plaintiff was found with an "altered level of consciousness" at approximately 5:55 p.m. on June 14, 2009.  (Id. ¶ 6.)  Nurse Stringer was not on duty when this occurred as her shift ended at 2:00 p.m. on that day. (Id.)  Plaintiff's UHR indicated that he was brought to the TTA at 6:15 p.m. that day and was evaluated by Registered Nurse Roca.  Plaintiff was sluggish, slow to respond to stimulus, and unable to focus when examined by Dr. Susan Pido shortly thereafter.  (Id.)  Dr. Pido ordered that Plaintiff be transferred to Coalinga Regional Medical Center that evening for further evaluation.  (Id.)

Plaintiff's allegations raised solely in his complaint are overcome by the testimony presented at his deposition, which belies his claim that Defendant Stringer acted with the requisite subjective culpable state of mind to be deliberately indifferent to his medical condition.

At this deposition taken on April 7, 2016, Plaintiff testified, in pertinent part as follows:

Q.      Let me ask you about Nurse Stringer.  What do you think Nurse Stringer should have done?

A.      The only thing that she could have done would have been to have escorted me over to the clinic on A facility and say hey, this inmate is claiming these symptoms, he needs to go to TTA and be checked out or at least seen by the doctor there and maybe they would have admitted me to TTA, and I could have got check out or – but that's – I mean I'm not going to stay that she had any more power than that.  That's really the only thing that she could have done, but taking me a little more serious than I felt I was taken, you know.  She might have just been joking, and I'm sure she was just joking. Nurse Stringer to me does not in my time there does not seem to me to have a mean bone in her body.  But like I said, I might be shooting myself in the foot with what I'm testifying to right now.  But I could have like to have been taken more serious and at least been taken over there to the clinic and say this inmate, this patient is having issues and we need to find out what those issues are.

(Pl.'s Dep. at 34:16-35:10.)

As previously stated, in order for Plaintiff to demonstrate a genuine issue of material fact as to liability against Defendant Stringer, he must demonstrate Stringer had actual, subjective knowledge of

an excessive risk of harm to Plaintiff, but failed to prevent it.  Farmer, 511 U.S. at 837-839.  That is, Plaintiff must prove that Defendant Stringer (1) was aware of facts from which a substantial risk of serious harm can be inferred, and (2) she actually drew that inference.  Id. at 837.  However, Plaintiff's deposition testimony demonstrates that he cannot create a genuine issue of material fact as to Stringer's alleged deliberate indifference.  Even assuming as Plaintiff contends in his complaint that he reported symptoms of dizziness and weakness to Defendant Stringer, Plaintiff acknowledged that she was "just joking" in her alleged response that he was drunk, and admits she could not have formulated the requisite subjective intent because she does not have a "mean bone in her body."  (Pl.'s Dep. at 35:3-5.)  Plaintiff's allegations, at most, demonstrate potential negligence on the part of Defendant Nurse Stringer which does not give rise to a claim for deliberate indifference.  See Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980) (the indifference to [the prisoner's] medical needs must be substantial.  Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action.") (citing Estelle v. Gamble, 429 U.S. 97, 105-106 (1976)).  Based on Defendant Stringer's declaration and Plaintiff's deposition testimony, the Court finds that there is no genuine issue of material fact that Defendant Stringer did not act with deliberate indifference to Plaintiff's health, and Defendant Stringer is entitled to summary judgment on Plaintiff's claim.

## IV.

## RECOMMENDATIONS

Based on the foregoing, it is HEREBY RECOMMENDED that:

1.      Defendants Nguyen and Stringer's motion for summary judgment be GRANTED; and

2.      The Clerk of Court be directed to enter judgment in favor of Defendants.

These Findings and Recommendation will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within **thirty (30) days** after being served with these Findings and Recommendation, the parties may file written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time

may result in the waiver of rights on appeal.  Wilkerson v. Wheeler, 772 F.3d 834, 838-39 (9th Cir.

2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).


IT IS SO ORDERED.

Dated:   **September 19, 2016**

_____
UNITED STATES MAGISTRATE JUDGE